Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

## THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| STEVE C. and A.C., <br><br> Plaintiffs, <br><br> vs. <br><br> CIGNA HEALTH and LIFE INSURANCE COMPANY, MARLABS INC., MINDTREE LIMITED, MARLABS HEALTH INSURANCE PLAN, and the MINDTREE LIMITED MEDICAL BENEFITS PLAN. <br><br> Defendants. | COMPLAINT |

Plaintiffs Steve C. ("Steve") and A.C., through their undersigned counsel, complain and

allege against Defendants Cigna Health and Life Insurance Company ("Cigna"), Marlabs Inc.,

Mindtree Limited (collectively the "Plan Admins"), Marlabs Health Insurance Plan, and the

Mindtree Limited Medical Benefits Plan (collectively "the Plans"), as follows:

//

//

//

## PARTIES, JURISDICTION AND VENUE

1. Steve and A.C. are natural persons residing in Douglas County, Colorado. Steve is A.C.'s father.

2. Cigna is an insurance company headquartered in Bloomfield, Connecticut and was the third-party claims administrator, as well as a fiduciary under ERISA, for each of the Plans during the treatment at issue in this case.

3. The Plan Admins were the designated administrators for the Plans during the treatment at issue. At all relevant times Cigna acted as agent for the Plans and the Plan Admins.

4. During the initial stages of A.C.'s treatment, A.C. was covered by the Mindtree Limited Benefits Plan. In May of 2021, coverage shifted to the Marlabs Health Insurance Plan. While there are differences between the governing plan documents, the overall terms of each plan are similar. Each of the Plans provide coverage for residential treatment care. Both Plans were administered by Cigna.

5. The Plans were self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Steve was a participant in the Plans and A.C. was a beneficiary of the Plans at all relevant times.

6. A.C. received medical care and treatment at Triumph Youth Services ("Triumph") from October 21, 2020, to August 6, 2021. Triumph is a treatment facility located in Box Elder County, Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

7. Cigna, acting in its own capacity or through its subsidiaries and affiliates, Cigna Behavioral Health and Evernorth Behavioral Health, denied claims for payment of A.C.'s medical expenses in connection with his treatment at Triumph.

8.  This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9.  Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Cigna does business in Utah, and the treatment at issue took place in Utah.

10. In addition, the Plaintiffs have been informed and reasonably believe that litigating the case outside of Utah will likely lead to substantially increased litigation costs they will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

11. The remedies the Plaintiffs seek under the terms of ERISA and under the Plans are for the benefits due under the terms of the Plans, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), for an award of statutory damages against the Plan Admins pursuant to 29 U.S.C. §1132(c) based on the failure of the Plan Admins and their agents, to produce within 30 days documents under which the Plans were established or operated, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

//

//

//

## BACKGROUND FACTS

### A.C.'s Developmental History and Medical Background

12. A.C. was born in Ethiopia and was placed in an orphanage with his younger brother when A.C. was about four years old. A.C. then moved to a transition home with other children for a few months before he was adopted by Steve.

13. A.C. showed some signs of having grown up in stressful conditions. His two front teeth were visibly blackened and decayed, which his dentist attributed to poor nutrition. At home in America, he frequently ate past the point of discomfort and demonstrated attachment issues. A.C. was very argumentative and had difficulty learning English.

14. A.C. continued to exhibit behavioral issues as he grew older. He often became angry or frustrated and would sometimes eat until he vomited. Calls from A.C.'s school due to issues such as disrespecting teachers or bullying other students were common. A.C. was sensitive about his skin color and was teased by others for having white parents.

15. A.C. was placed on an individualized education plan and was found to have issues focusing, underdeveloped executive functioning skills, and was behind his peers in reading and writing ability.

16. A.C. was argumentative and dismissive towards others and his mother especially. After arguments with her, he would often run away from home and turn off his phone so that he couldn't be tracked or located.

17. A.C. was diagnosed with oppositional defiant disorder and attention-deficit hyperactivity disorder. Despite receiving treatment for these, his behavior continued to deteriorate and he had frequent angry outbursts and continued to struggle academically.

18. A.C. was caught abusing substances and was taken into custody by the police after drinking underage at a party. A.C. met with a therapist but did not make any demonstrable improvements.

19. A.C. continued to abuse substances as he grew older, he was increasingly defiant and refused to follow any rules Steve or others attempted to set. On one occasion, he tried to open the door of a moving car after he was being taken home due to leaving the house without permission.

20. A.C. frequently skipped school and was caught stealing money from his parents. Because other attempts at intervention had failed, and A.C.'s condition continued to deteriorate, he was admitted to Triumph.

**Triumph**

21. A.C. was admitted to Triumph on October 21, 2020.

22. In a letter dated November 12, 2020, Cigna denied payment for A.C.'s treatment from November 13, 2020, forward. The letter stated in pertinent part:

> Based upon the available information, your symptoms do not meet the Cigna Behavioral Medical Necessity Criteria for Residential Mental Health Treatment for Children and Adolescents for continued stay from 11/13/2020 forward, as you are not demonstrating impairment in function across multiple settings due to a moderate to severe mental health disorder which requires access to 24 hour psychiatric intervention and nursing monitoring for safe and effective treatment. There are no medical or psychiatric symptoms which are actively interfering with your ability to effectively participate in treatment in less intensive levels of care. As opposed to active treatment that would improve your functioning so that you can receive treatment in a less restrictive setting, care for the sake of a safe and structured environment is not considered medically necessary. Less restrictive levels of care are available for safe and effective treatment.

23. On April 30, 2021, Steve submitted a level one appeal for the denial of payment for A.C.'s treatment from November 13, 2020, forward. Steve wrote that he was entitled to certain protections under ERISA during the appeals process, including a full, fair, and

thorough review of the denial conducted by appropriately qualified reviewers which took into account all of the information he provided, gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

24. He asked that Cigna's reviewer be board certified in child and adolescent psychiatry with experience treating individuals with A.C.'s diagnoses. He also requested that the reviewer be trained in the details of MHPAEA to respond to the arguments he raised concerning a violation of the statute. In addition, he asked to be provided with a copy of any documentation related to any adverse determinations, including the reviewers' case notes and reports.

25. Steve wrote that A.C.'s treatment at Triumph had been effective and A.C. had made considerable progress while there. He contended that without this treatment, A.C. would not have been able to resolve his issues with substance use, oppositionality, lack of trust, and attachment problems.

26. Steve included copies of A.C.'s medical records with the appeal. These records showed that A.C. continued to struggle with attachment, poor decision making, drug cravings, a substance use relapse, and low self-worth,

27. Steve shared a report from the U.S. Surgeon General's office on the dangers of substance use and the dangers it posed to adolescent users. He wrote that A.C.'s substance use put him at risk of serious harm, especially given A.C.'s history of relapse.

28. Steve wrote that A.C. needed to be removed from his home environment to make any sort of lasting progress. He wrote that A.C. had a significant history of trauma and other deep-seated issues which needed specialized treatment to effectively address. He wrote that he

was aware of no outpatient programs which would have been able to effectively treat A.C.

29. He contended that A.C. met the requirements of Cigna's behavioral health medical necessity criteria for residential treatment, as well as the definition of medical necessity in his insurance plan, along with generally accepted standards of medical practice.

30. He argued that the denial of payment appeared to constitute a violation of MHPAEA. He wrote that MHPAEA compelled insurers to ensure that benefits for behavioral health services were offered at parity with benefits for analogous medical or surgical services. He identified skilled nursing, subacute rehabilitation, and inpatient hospice care as some of the medical or surgical analogues to the treatment A.C. received.

31. He wrote that Cigna required residential treatment centers to meet strict requirements contained in various guidelines, yet it appeared to have no such guidelines for analogous medical or surgical services. He asked Cigna to perform a MHPAEA compliance analysis to ensure the statute was being properly applied. Steve asked to be provided with physical copies of the results of this analysis.

32. In addition Steve asked to be provided with a copy of all documents under which his insurance plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these were used), together with any reports or opinions regarding the claim from any physician or other professional, along with their names, qualifications, and denial rates (collectively the "Plan Documents").

33. In a letter dated June 4, 2021, Cigna upheld the denial of payment for A.C.'s treatment
    from November 13, 2020, to May 3, 2021. The letter gave the following justification for
    the denial:

    > Based upon the available clinical information received initially and with this
    > appeal, your symptoms did not meet Medical Necessity Criteria for continued stay
    > at Residential Mental Health Treatment for Child/Adolescent from 11/13/2020 to
    > 05/03/2021 as the treatment provided had led to sufficient improvement in the
    > moderate-to-severe and acute symptoms and/or behaviors that led to this
    > admission so that you could be safely and effectively treated at a less restrictive
    > level of care. You were not reported to be voicing thoughts of harm to self or
    > others. You were described as cooperative and participating in the treatment. You
    > had not developed new symptoms and/or behaviors that required this intensity of
    > service for safe and effective treatment. Less restrictive levels of care were
    > available for safe and effective treatment.

34. On January 21, 2022, Steve submitted an appeal for dates of service between May 10,
    2021, and August 6, 2021. He wrote that he had received Explanation of Benefits
    statements for these dates which denied payment due to:

    > A0- Services are reduced or denied for no behavioral health authorization on file.

    and

    > Our records do not reflect an authorization on file and additional information from
    > the health care provider is needed to review the claim for medical necessity.

35. He reminded Cigna that it had a duty to act according to his best interests and had certain
    obligations under ERISA during the review process to ensure that a full, fair, and
    thorough assessment was performed.

36. He wrote that Cigna's statement that no authorization was on file was untrue. He
    attributed the confusion to A.C. receiving a new member ID and group number in May of
    2021 after his insurance plan coverage changed. He stated that after this shift took place,
    Triumph attempted to contact Cigna and after several calls to numerous different people,
    had been told that the claims had been voided and closed out.

37. Steve wrote that it was clear that Triumph had properly attempted to seek authorization for A.C.'s claims but Cigna had mishandled the retrospective review process, and any denial due to lack of authorization was solely due to Cigna's error.

38. Steve attached updated copies of A.C.'s medical records with the appeal. He wrote that A.C.'s treatment was consistent with generally accepted standards of medical practice, the definition of medical necessity in his insurance documents, and was clinically appropriate in terms of type, frequency, extent, site, and duration. He again asked to be provided with a copy of the Plans Documents.

39. In a letter dated March 14, 2022, Cigna upheld the denial of payment for A.C.'s treatment for dates of service between May 3, 2021, and August 6, 2021. The letter gave the following justification for the denial of payment:

> Based upon my review of the available clinical information received initially and with this appeal and the MCG Behavioral Criteria Guidelines [sic] medical necessity was not met for Residential Behavioral Health Level, Child or Adolescent, ORG: B-902-RES from 5/3/2021 - 8/6/2021. The treatment provided had led to sufficient improvement in the moderate-to-severe and acute symptoms and/or behaviors that led to this admission so that you could be safely and effectively treated at a less restrictive level of care. You did not have a clinical condition related to the admission diagnosis that cannot be safely and effectively treated at an available less restrictive level of care. You were not having adverse medication effects that could not be safely and effectively managed at an available less restrictive level of care. You did not have co-existing medical conditions or complications that could not be safely and effectively managed at an available less restrictive level of care. Less restrictive levels of care were available for safe, effective treatment.

40. On July 7, 2022, Steve requested that the denial of payment for A.C.'s treatment for dates of service between May 10, 2021, and August 6, 2021, be evaluated by an external review agency. He contended that Cigna had failed to abide by its obligations under ERISA, had not furnished him with the documentation he requested, and had given no

indication that any sort of MHPAEA compliance analysis had taken place, in spite of his request.

41. He wrote that Cigna cited to the MCG criteria as informing its decision to deny payment, but he argued that these criteria had been misapplied, and A.C.'s treatment had been denied even though A.C. did not meet the requirements for discharge in these same criteria.

42. He wrote that among other things, A.C. continued to struggle with risk status, functional impairment, substance abuse issues, and had not met all his treatment plan goals. He stated that it was clear from A.C.'s medical records that he was not able to be discharged, and the reviewer's statement that A.C. did not have a clinical condition related to the admission diagnosis which could have been treated at a lower level of care was plainly false.

43. He wrote that less restrictive levels of care were neither the safest nor most effective treatment for A.C. and could have undermined his progress, nor was there a lower level of care available which could have produced equivalent results. He argued that Triumph was the least intensive setting that was appropriate for A.C.

44. In a decision dated October 1, 2022, the external review agency upheld the denial of payment for A.C.'s treatment for dates of service between May 3, 2021, and August 6, 2021. The reviewer gave the following justification for the denial: (internal citations omitted)

> On review of the documentation of the dates of service in question, there is no evidence that the patient demonstrated the severity of symptoms that would require the 24-hour supervision of a residential treatment facility. During DOS 5/3/21 to 8/6/21, he was not exhibiting any suicidal ideation, homicidal ideation, recurrent thoughts of self-harm, or inability to demonstrate self-preserving behaviors or manage his activities of daily living which would place him at high

risk of hospitalization. There was no evidence of significant interpersonal conflict (such as persistent argumentativeness, poor or intrusive boundaries causing anger in others and requiring staff redirection, threatening behavior, or the inability to establish positive peer or adult relationships) that would also necessitate the residential treatment center level of care. Additionally, during DOS 5/3/21 to 8/6/21, he did not have any emotional symptoms consistent with poor impulse control or oppositional behavior that would necessitate this level of care, including aggressive behavior, destruction of property, poor impulse control, homicidal ideation without intent, paranoia, non-suicidal self-injury, or persistent rule violations. During DOS 5/3/21 to 8/6/21, he did not exhibit any psychiatric symptoms that would necessitate the supervision of a residential treatment facility, including severe anxiety, depression, hypomania, obsessions/compulsions, or psychosis. Finally, during home visits, it is mentioned that he got into arguments with family but that these were able to be resolved. It is not mentioned that the patient exhibited problematic behaviors such as running away, aggression, destruction of property, etc., that would necessitate continued residential treatment.

Given the absence of these symptoms or behaviors, the patient was able to be treated at a lower, less restrictive level of care during DOS 5/3/21-08/06/21. During these dates of service, the patient does not appear to meet the evidence-based guidelines for continued residential treatment of the child and adolescent level of care utilization system of the American Association of Community Psychiatrists. Treating patients at a more restrictive level of care than is clinically indicated not in accordance with the treatment recommendations and clinical practice guidelines of the American Academy of Child and Adolescent Psychiatry.

Therefore, the residential treatment from 5/3/21 to 8/6/21 would not be supported as medically necessary based on the applicable benefit plan language and standards of care.

45. On September 29, 2022, Steve also requested that the denial of payment for A.C.'s treatment between November 13, 2020, and May 3, 2021, be evaluated by an external review agency. He asked that the reviewer be appropriately qualified and that they carefully review the significant clinical evidence he had included.

46. He expressed concern that Cigna's reviewer made no reference in its denial letters to any particular clinical evidence from A.C.'s medical records or any other documents it had received to support its decision to deny payment.

47. He contended that Cigna had misapplied its proprietary criteria and was not in compliance with generally accepted standards of medical practice. He wrote that some of the requirements it referenced as being necessary according to its criteria such as a reference to harm to self or others were not actually requirements in the criteria themselves. He stated that the reviewer appeared to have "cherry-picked" other aspects of the criteria for their convenience.

48. For instance, Steve quoted Cigna's continued stay criteria and noted that there were no actual requirements of harm to self or others, and in instances where the criteria mandated that one or more factors be met in order for treatment to be approved, the reviewer only identified one factor that A.C. allegedly failed to meet while ignoring the factors he did meet, which should have led to A.C.'s treatment being approved.

49. He stated that Cigna's reviewer based their denial on a series of conclusory statements which were unsupported by the clinical evidence or its own criteria. He argued that if Cigna had evaluated its criteria properly, it would have seen that A.C. met all the necessary requirements for his care to be approved.

50. Steve stated that A.C.'s treatment at Triumph was rendered in accordance with generally accepted standards of medical practice, was based on the recommendations of his treatment team, and was the most clinically appropriate treatment which could safely and effectively treat his conditions.

51. He contended that A.C. could not have been effectively treated in a lower level of care and remained at a very high risk of relapse even during the first several months of his treatment at Triumph. He wrote that A.C. had clearly not completed his treatment program goals before even a single month of treatment had elapsed.

52. Despite Steve's request, he received no response to his external treatment appeal for dates of service between November 13, 2020, and May 3, 2021, and in a letter dated May 4, 2023, Cigna stated that Steve was not entitled to another external review, as an external review had already been performed.

53. After failing to receive the documentation he requested, Steve made one last attempt to procure these materials in a letter dated August 17, 2023, by requesting them directly from Cigna and each of the Plan Admins. In particular, he asked to be provided with:

- Disclosure of the identities of all individuals with clinical or medical expertise who evaluated the treatment for my son, [A.C.], at Triumph Youth Services, copies of those individuals' *curriculum vitae*, copies of any memoranda, emails, reports, or other documents reflecting the rationale of the reviewers in denying coverage for [A.C.'s] claim;
- A complete copy of both the medical necessity criteria utilized by Cigna in determining that [A.C.'s] treatment was not medically necessary and that treatment for him at a lower level of care was appropriate;
- A complete copy of the medical necessity criteria utilized by the Plan for skilled nursing facilities, sub-acute inpatient rehabilitation treatment, and inpatient hospice treatment.  This is necessary to allow me to carry out an evaluation of whether the Plan has complied with the requirements of the federal Mental Health Parity and Addiction Equity Act;
- Copies of documents identifying the self-compliance analysis the Plan and Cigna have carried out to determine the extent to which they are complying with the federal Mental Health Parity and Addiction Equity Act.
- Complete copies of any and all internal records compiled by Cigna, Marlabs, inc. and MindTree Limited in connection with [A.C.'s] claim including, but not limited to, telephone logs, memoranda, notes, emails, correspondence, or any other communications;
- A copy of the summary plan description, master plan document, certificate of insurance, insurance policy, and any other document under which [A.C.'s] insurance plan is operated;
- Copies of any and all administrative service agreements, contracts or other documents which described and defined the relationship, rights and obligations of and between you, the Plan administrator, and Cigna; and
- Copies of any and all documents outlining the level of accreditation required for residential treatment programs;
- Copies of any and all documents showing whether analogous levels of care to residential treatment programs also require these levels of accreditation; and

- Copies of documents identifying the process, strategies, evidentiary standards, or other factors the Plan used to determine that the treatment at Triumph Youth Services was experimental and investigational.
- Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to determine whether treatment at sub-acute inpatient programs for medical or surgical treatment is experimental and investigational.
- Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the Plan.

54.  A.C. sent his letters to Cigna and the Plan Admins by certified mail, return receipt requested. Each of the three letters was received by Cigna and the Plan Admins but none of them provided any response to A.C.

55. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plans and ERISA.

56. The denial of benefits for A.C.'s treatment was a breach of contract and caused Steve to incur medical expenses that should have been paid by the Plans in an amount totaling over $125,000.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

57. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Cigna, acting as agent of the Plans, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plans. 29 U.S.C. §1104(a)(1).

58. Cigna and the Plans failed to provide coverage for A.C.'s treatment in violation of the express terms of the Plans, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

59. ERISA also underscores the particular importance of accurate claims processing and

evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

60. The denial letters produced by Cigna do little to elucidate whether Cigna conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled.

61. Cigna failed to substantively respond to the issues presented in Steve's appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

62. Cigna and the agents of the Plans breached their fiduciary duties to A.C. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in A.C.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of A.C.'s claims.

63. The actions of Cigna and the Plans in failing to provide coverage for A.C.'s medically necessary treatment are a violation of the terms of the Plans and its medical necessity criteria.

64. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first, second, and third causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

//

//

**SECOND CAUSE OF ACTION**

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

65. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Cigna's fiduciary duties.

66. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

67. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

68. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

69. The medical necessity criteria used by Cigna for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical

necessity criteria the Plans apply to analogous intermediate levels of medical or surgical benefits.

70. Comparable benefits offered by the Plans for medical/surgical treatment analogous to the benefits the Plans excluded for A.C.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

71. When Cigna and the Plans receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plans based on generally accepted standards of medical practice.

72. Cigna and the Plans evaluated A.C.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plans denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

73. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Cigna's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that A.C. received. Cigna's improper use of acute inpatient medical necessity criteria is revealed in the statements in Cigna's denial letters such as " You were not reported to be voicing thoughts of harm to self or others."

74. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that A.C. received. The Plans does not require individuals receiving treatment at sub-acute

inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive Plan benefits.

75. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

76. Even if an acute care requirement is not written in Cigna's policy, Cigna's use of acute level requirements in its denial letters demonstrates that it relied on such factors when determining whether A.C.'s treatment was medically necessary.

77. Steve noted that Cigna restricted the availability of A.C.'s treatment by forcing it to comply with requirements contained only within proprietary criteria. Steve argued that not only did Cigna exempt comparable medical or surgical services from these requirements, but it did not appear to have proprietary medical or surgical criteria for analogous medical/surgical care at all.

78. Steve requested to be provided with these proprietary criteria if they existed, but Cigna and the Plan Admins ignored this request.

79. The violations of MHPAEA by Cigna and the Plans are breaches of fiduciary duty and give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plans and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plans to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plans as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

## **THIRD CAUSE OF ACTION**

### **(Request for Statutory Penalties Under 29 U.S.C. §1132(a)(1)(A) and (c))**

80. Cigna, acting as agent for the Plan Admins, is obligated to provide to participants and beneficiaries of the Plans within 30 days after request, documents under which the Plans were established or operated, including but not limited to any administrative service agreements between the Plans and Cigna, the medical necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facilities.

81. In spite of Steve's requests during the appeal process for Cigna to produce the documents under which the Plans were operated, Cigna repeatedly failed to produce to the Plaintiffs the documents under which the Plans was operated, including but not limited to any administrative service agreements between the Plans and Cigna, the medical necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facility treatment within 30 days after they had been requested.

82. After Cigna repeatedly failed to provide these materials, Steve sent one final letter dated August 17, 2023, to both Cigna and the Plan Admins again requesting the documents which he was statutorily entitled to receive upon request. Cigna and the Plan Admins did not respond to Steve's request for documents.

83. The failure of the Plan Admins and their agent Cigna, to produce the documents under which the Plans were operated, as requested by the Plaintiffs, within 30 days of Steve's request for ERISA documents, provides the factual and legal basis under 29 U.S.C. §1132(a)(1)(A) and (c) for this Court to impose statutory penalties against the Plan Admins up to $110 per day from 30 days from the date of each of these letters to the date of the production of the requested documents.

84. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for A.C.'s medically necessary treatment at Triumph under the terms of the Plans, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs'

Second Cause of Action;

3.      For an award of statutory penalties of up to $110 a day against the Plan Admins after the first 30 days for each instance of the Plan Admins' and their agent Cigna's failure or refusal to fulfill their duties, to provide the Plaintiffs with the documents they had requested.

4.      Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

5.      For such further relief as the Court deems just and proper.

DATED this 20th day of October, 2023.

By     s/ Brian S. King
        Brian S. King
        Attorney for Plaintiffs

County of Plaintiffs' Residence:
Douglas County, Colorado